IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| NATIVE ECOSYSTEMS COUNCIL, ALLIANCE FOR THE WILD ROCKIES, and COUNCIL ON FISH & WILDLIFE, | CV 25–25–M–DLC |
| Plaintiffs, | ORDER |
| vs. | |
| AARON WEBBER, Townsend District Ranger, Helena Lewis & Clark National Forest; EMILY PLATT, Supervisor, Helena Lewis & Clark National Forest; LEANNE MARTEN, Regional Forester, U.S. Forest Service Northern Region; U.S. FOREST SERVICE; U.S. FISH & WILDLIFE SERVICE, | |
| Defendants, | |
| and | |
| SUN MOUNTAIN LUMBER, INC., a Montana Corporation, | |
| Intervenor-Defendant. | |

Before the Court is Plaintiffs' Motion for Preliminary Injunction and/or Motion for Temporary Restraining Order. (Doc. 6.) On June 3, 2025, the Court held a hearing on the Motion. (Doc. 21.) For the reasons herein, the Motion is DENIED.

1

## FACTUAL AND PROCEDURAL BACKGROUND

The Wood Duck Project (the "Project") is located in the Big Belt Mountains on the Townsend Ranger District of the Helena–Lewis and Clark National Forest. (Doc. 7-1 at 4.) The ecosystems found in the Project area provide forage for big game and livestock, hunting opportunities, important terrestrial wildlife and aquatic habitat, timber, scenery, and recreation. (*Id.*)

Over the past several decades, mountain pine beetle, western spruce budworm, and Douglas-fir bark beetle activity have substantially altered forest vegetation within the Project area. (*Id.*) In addition, the 2021 Woods Creek and Deep Creek Canyon Fires collectively burned over 60,000 acres across the Big Belt Geographic Area, overlapping with a large portion of the Project area. (*Id.*) The fires altered forest vegetation within the Project area, converting mature stands of Douglas-fir and lodgepole pine to very young forests dominated by seedlings while reducing overall stand density. (*Id.*) Many unburned Douglas-fir stands within and adjacent to the fire perimeters remain moderately to highly susceptible to western spruce budworm and Douglas-fir beetle caused damage or tree mortality. (*Id.*) Wildfire and fire suppression activities have impacted soils, watershed function, fisheries, and noxious weed populations. (*Id.*)

The purpose of the Project is to reduce stand density, reduce insect hazard, improve residual tree growth, diversify species composition, enhance stand health,

and support local employment and the community. (*Id.* at 8.) The Project further seeks to minimize potential widescale tree mortality while creating a landscape that is more resilient to future climates and disturbances. (*Id.* at 4, 7, 51.) The Project includes 1,241 acres of commercial logging, 15.1 miles of new temporary road construction, 9.9 miles of road reconstruction, and 7.8 miles of road reconditioning. (*Id.* at 7.) The Project does not authorize any construction of new permanent roads. (*Id.* at 5, 43.)

The Project area encompasses five elk analysis units: Boulder Baldy, Confederate, North Fork, Ray Creek, and Wagner-Thomas. (Doc. 7-4 at 14.) The Project is in Northern Continental Divide Ecosystem ("NCDE") management Zone 2, within the Big Belt Geographic Area, and encompasses the Middle and South Belts grizzly bear analysis units ("GBU"). (Doc. 7-1 at 43.)

The United States Forest Service ("USFS") originally proposed the Project to the public for comment in October 2022. (*Id.* at 8.) In April 2023, USFS published a draft Environmental Assessment ("EA"), draft decision notice ("DN"), finding of no significant impact ("FONSI"), and supporting documents. (Doc. 7-2 at 16.) Over the course of the 45-day administrative objection period, the USFS received four objections. (Doc. 7-1 at 9.) After considering the objections and visiting the site with two of the objectors, USFS adjusted treatment types, harvest methods, temporary road locations and mileages, and reduced overall treatment

acres. (Doc. 7-2 at 16–17.) In April 2024, USFS issued the final EA and DN/FONSI authorizing immediate harvest, regeneration, and pre-commercial thinning on approximately 1,241 acres. (Doc. 7-2.)

On September 17, 2024, Sun Mountain Lumber was awarded the Wood Duck Timber Sale. (Doc. 14 at 9.) In October 2024, Sun Mountain Lumber began operations under the contract. (*Id.*) To date, Sun Mountain Lumber has completed 214 acres of the 357 acres of mandatory harvest. (*Id.*)

On February 18, 2025, Plaintiffs filed their Complaint alleging that: (1) the Project violates the Forest Plan, the Project EA violates the National Environmental Policy Act ("NEPA"), and/or the revised Forest Plan violates the National Forest Management Act ("NFMA") planning regulations regarding elk; (2) the Project violates the Forest Plan, the Project EA violates NEPA, and/or the revised Forest Plan violates NFMA planning regulations regarding grizzly bears; (3) the Project EA fails to fully and fairly disclose accurate available data to the public regarding roads, and fails to take the requisite hard look at the cumulative effects of existing high road density, new Project roads, pervasive illegal motorized use, and roads closed-on-paper-only by the Travel Plans; (4) the Project violates the Forest Plan, the Project EA violates NEPA, and/or the Revised Forest Plan violates the NFMA planning regulations regarding old growth; and (5) the Forest Service's failure to prepare an EIS for the Project violates NEPA.

On May 9, 2025, Plaintiffs filed the present Motion. (Doc. 6.) On May 21, 2025, the Court granted Intervenor-Defendant Sun Mountain Lumber's Motion to Intervene. (Doc. 12.)

Additional facts in the record are discussed as they become relevant in the analysis below.

## LEGAL STANDARDS

### I.    NEPA

NEPA declares a national policy of protecting environmental quality and encouraging a "productive and enjoyable harmony between man and his environment." 42 U.S.C. §§ 4321, 4331. NEPA "does not mandate particular results[.]" *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). Rather, it "prescribes the necessary process" that federal agencies must follow when considering "major Federal actions significantly affecting the quality of the human environment." *Id.* at 348–50. "NEPA's central requirement is that agencies must take a 'hard look' at the environmental consequences of [their] proposed action." *State of Cal. v. Block*, 690 F.2d 753, 776 (9th Cir. 1982). An agency may prepare an EA "for a proposed action that is not likely to have significant effects or when the significance of the effects is unknown." 40 C.F.R. § 1501.5(a). Importantly, "the central judicial review in NEPA cases is deference." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, 2025 WL 1520964, at *6 (U.S. May

29, 2025).

## II.    NFMA

NFMA mandates that USFS "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System, coordinated with the land and resource management planning processes of State and local governments and other Federal agencies." 16 U.S.C. § 1604(a). Land and resource management plans—commonly referred to as forest plans—must "provide for multiple use and sustained yield of the products and services obtained" from individual forest units, and must "include coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness." *Id.* § 1604(e)(1). Forest plans must also "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives." *Id.* § 1604(g)(3)(B). All projects planned within a forest unit must be consistent with the forest plan as well as any regulations in effect at the time of the decision. *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1249 (9th Cir. 2005); *see also* 16 U.S.C. 1604(i).

## III.    Preliminary Injunction

"An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010). Typically, "a plaintiff seeking a preliminary injunction must

6

establish that he is likely to succeed on the merits, that he is likely to suffer

irreparable harm in the absence of preliminary relief, that the balance of equities

tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res.*

*Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "Under the sliding scale approach to a

preliminary injunction, the elements of the preliminary injunction test are

balanced, so that a stronger showing of one element may offset a weaker showing

for another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir.

2011). The Ninth Circuit has adopted an alternative "serious questions" test under

which a court may issue a preliminary injunction "where the likelihood of success

is such that serious questions going to the merits were raised and the balance of

hardships tips sharply in plaintiff's favor." *Id.* at 1131–32 (internal quotations

omitted). The Court reviews the first prong of the preliminary injunction test—

serious questions—under the APA's "arbitrary and capricious" standard, which

presumes agency actions to be valid. *Lands Council v. McNair*, 537 F.3d 981, 987

(9th Cir. 2008).

**DISCUSSION**

## I.    Serious Questions Going to the Merits

Plaintiffs argue that the Project violates NEPA and NFMA because: (1) the

Forest Service is not complying with Forest Plan provisions for elk and the Project

EA fails to take a hard look at impacts on elk; and (2) the Forest Service is not

7

complying with Forest Plan provisions for grizzly bear connectivity and the Project

EA fails to take a "hard look" at impacts to grizzly bear connectivity. (Doc. 7 at 10,

22.)

### A. NEPA, NFMA, and Elk

Plaintiffs argue that the Project EA lacks discussion and disclosure of three

specific forest plan provisions. (*Id.* at 13–14.) Specifically, Plaintiffs challenge the

Project's consistency with NEPA and NFMA in its evaluation of two desired

conditions (FW-FWL-DC-01 and FW-FWL-DC-04) and one guideline (FW-FWL-

GDL-01).

As a threshold matter, Plaintiffs contend that both the desired conditions and

the guideline set forth requirements with which the Government *must* comply. (*See*

*id.* at 13.) Plaintiffs are wrong.

Regarding desired conditions, the 2012 NFMA planning regulations states:

> A desired condition is a description of specific social, economic, and/or
> ecological characteristics of the plan area, or a portion of the plan area,
> toward which management of the land and resources should be directed.
> Desired conditions must be described in terms that are specific enough
> to allow progress toward their achievement to be determined, but do not
> include completion dates.

36 C.F.R. § 219.7(e)(1)(i). To comply with a desired condition, a project must

"contribute[] to the maintenance or attainment of . . . [the] desired condition[]" and

must "not foreclose the opportunity to maintain or achieve . . . [the] desired

condition[] . . . over the long term." 36 C.F.R. § 219.15(d)(1). At the hearing,

Plaintiffs pointed the Court to the final rule and record of decision on 36 C.F.R. Part 219, where USFS explained "Projects and activities must be consistent with desired conditions as described in § 219.15." 77 Federal Registrar 21204. However, in the same paragraph, USFS stated "[i]n some instances, desired conditions may only be achievable in the long-term." *Id.*

Plaintiffs challenge the Project's consistency with two desired conditions. First, Forest Plan Desired Condition FW-FWL-DC-01 which states "Big game species remain on [National Forest System] lands throughout the archery and rifle hunting seasons at levels that support Montana Fish, Wildlife, and Parks recommendations regarding big game distribution, population size, and harvest." (*Id.* at 13 (citing Doc. 7-5 at 14).) Second, Forest Plan Desired Condition FW-FWL-DC-04 which states: "Levels and types of public motorized access during the archery and rifle hunting seasons are balanced with desired conditions for wildlife populations and habitat security, as well as with other resource desired conditions." (*Id.*)

As to guidelines, the federal registrar defines a guideline as "a constraint on project activity decisionmaking that allows for departure from its terms, so long as the purpose of the guideline is met." 36 C.F.R. § 219.7(e)(1)(iv). Forest Plan Guideline FW-FWL-GDL-01 states:

> Prior to management actions that would increase or change the location, timing, mileage, or density of wheeled motorized routes open during

the archery and rifle hunting seasons, [Forest Service] biologists should coordinate with Montana Fish, Wildlife, and Parks biologists to identify possible management actions that may reduce the potential for displacement of big game species from [National Forest Service] lands during the archery and rifle hunting seasons. Possible management actions may vary on a project-specific or local basis, and should be based on scientific information and the most current recommendations made through agency or interagency efforts (such as that described in the U.S. Forest Service and Montana Department of Fish, Wildlife and Parks Collaborative Overview and Recommendations for Elk Habitat Management on the Custer, Gallatin, Helena, and Lewis and Clark National Forests 2013, [commonly referred to as the "Eastside Assessment"] or subsequent versions). Also see appendix C section titled "Elk and Other Big Game Species."

(Doc. 7-5 at 14.)

Plaintiffs contend that the Project EA lacks any disclosure or discussion of the three Forest Plan provisions outlined above. (Doc. 7 at 14.) However, the EA recognized that "motorized routes, . . . if abundant enough, can shunt elk away from habitat sites that they would prefer to use." (Doc. 7-2 at 87.) But the Project does not propose "new construction of system roads or decommissioning of existing open roads." (Doc. 7-2 at 21.) While the Project initially proposed adding 23.9 miles of temporary roads, the EA explains that implementation of the Project would only require 15.1 miles of temporary roads. (Docs. 7-1 at 15; 7-2 at 20.) Those roads are closed to the public and would be used only occasionally for administrative travel and management activity. (Doc. 7-1 at 5, 43; 7-2 at 20.) Therefore, as explained in the EA, the use of those roads can reasonably be excluded in the habitat effective analysis. (Docs. 7-8 at 16; 7-2 at 88.)

Additionally, the Court notes with particular interest that the Project treatment area overlaps with a minimal portion of each elk herd unit that could be impacted by the Project. (Doc. 7-2 at 98.) As the EA highlights, the Project will only impact 1,175 acres of spring, summer, and winter elk habitat, while the average home range of the species is 20,000 to 35,000 acres. (*Id.*)

Plaintiffs highlight Montana Department of Fish, Wildlife, and Parks' ("FWP") estimate through a November 2022 letter that "90–95% of the elk in" Hunting District 391 where the Project area is located "are located on private land during the general rifle season," and FWP's belief that "this is primarily due to poor elk security." (Doc. 7 at 10 (quoting Doc. 7-3 at 3).) The Court does not attach as much significance to FWP's comments. First, the comments were made when the Project area was 3,000 acres, compared to the current 1,200-acre project. (*Compare* Doc. 7-1 at 15 *with* Doc. 7-2 at 20.) The number of roads that would be built was reduced from 24 to 15. (*Id.*) As Defendants correctly concluded at the hearing, the Project that is the subject of this lawsuit is not the same project that FWP wrote to USFS about in November 2022. Further, FWP's statement contains no analysis, it is simply a belief based on an estimate. Importantly, the November 2022 letter has no binding effect. Nevertheless, USFS responded to FWP's comments. The Court does not find serious questions going to the merits that

11

would suggest USFS failed to take a "hard look" at the desired conditions and guidelines for elk in the EA.

Similarly, Plaintiffs have not established serious questions going to the merits that the Project violates NFMA. As set forth above, the record suggests that USFS thoroughly considered the effect of road construction on elk security during hunting season. USFS decreased the number of miles of roads constructed. USFS considered the causes of elk migration to private land during hunting season. (Doc. 7-2 at 97.) USFS evaluated the long-term effects of road construction on habitat effectiveness. (*Id.* at 88.) USFS weighed the small treatment area against the huge home range of elk. (*Id.* at 98.) And, importantly, USFS selected treatment areas that overlap with only small portions of each herd unit. (*Id.*)

Through the Project Elk Report, incorporated into the EA by reference, USFS also included the following design features that address desired conditions FW-FWL-DC-01:

(1) All temporary roads constructed would be closed to public use with a physical device (e.g. gates, barricades) during implementation and obliterated immediately following use. Closure devices would be placed in a location deemed effective at the time of installation. In addition, natural barriers (trees, rocks) would be retained adjacent to the closure device to limit public access. Closure devices would remain closed at all times except at the time of ingress and egress;

(2) For permanent roads closed seasonally or yearlong that are associated with treatment units, natural barriers adjacent to the closure device would be retained during road reconstruction or

reconditioning and after project implementation in order to discourage unauthorized access. If a closure device (e.g. gate, barricade) is currently not in place, one will be installed prior to activities. Closure devices would remain closed per the closure order for permanent roads except at the time of ingress and egress;

(3) Ground-based mechanical operations will be prohibited during the first two weeks of the general rifle season in order to maintain big game habitat capability and hunting opportunity. Log hauling, road reconstruction and road maintenance on routes designated open to the public will be considered on a case by case basis and authorized when safety concerns can be mitigated;

(4) Recreational use of firearms would be prohibited for anyone working within an area closed to the general public; and

(5) Slash clean-up inside treatment units would be reduced below 1.5 feet.

(Doc. 7-4 at 11–12.) The first and second design features also address desired condition FW-FWL-DC-04. (*Id.*)

Importantly, USFS specifically found that the Project does not preclude achievement of desired conditions FW-FWL-DC-01 and FW-FWL-DC-04. (Doc. 7-6 at 4–5.)

The Project Elk Report also includes the following design feature that address Forest Plan Guideline FW-FWL-GDL-01: "To reduce impacts to elk, concentrate harvest activity spatially and temporally coordinate with the wildlife biologist and Montana Department Fish, Wildlife, and Parks prior to implementation." (Doc. 7-4 at 12.) The Forest Plan Consistency Table reflects how

13

FW-FWL-GDL-01 will be implemented and explains "[t]he Project does not permanently increase or change the location, timing, mileage, or density of wheeled motorized routes open during archery and rifle hunting seasons. The[y] are temporary." (Doc. 7-6 at 6–7.)

Plaintiffs argue that pursuant to FW-FWL-GDL-01, USFS was required to implement U.S. Forest Service and Montana Department of Fish, Wildlife and Parks Collaborative Overview and Recommendations for Elk Habitat Management on the Custer, Gallatin, Helena, and Lewis and Clark National Forests 2013 (the "Eastside Assessment"). (Doc. 7 at 14.) But, as outlined in the language of the guideline, the Eastside Assessment only becomes relevant where a project "increase[s] or change[s] the location, timing, mileage, or density of wheeled motorized routes open during the archery and rifle hunting seasons." Because the USFS found that the Project would not permanently increase or change the nature of open roads during hunting seasons, it was not required to consider the Eastside Assessment.

With all the above in mind, the Court finds that Plaintiffs have failed to meet their burden of establishing serious questions going to the merits of their first argument. The evidence before the Court at this stage does not suggest: (1) that Defendants failed to take the required "hard look" at the desired conditions and

guidelines for elk in the EA; nor (2) that the Project violates NFMA because it is inconsistent with the Forest Plan provisions on elk.

### B. NEPA and NFMA as to Grizzly Bears

Forest Plan Desired Condition BB-WL-DC-03 provides: "The Big Belt [Geographic Area] provides habitat connectivity for wide ranging species (e.g. grizzly bear and others) between public lands in northern Montana and those in south and southwestern Montana, including lands in the Greater Yellowstone Ecosystem." (Doc. 7-5 at 16.)

Plaintiffs contend that the Project does not comply with the condition and that USFS failed to take a hard look at impacts to grizzly bear connectivity. (Doc. 7 at 22.) As to NEPA, Plaintiffs argue that USFS "has not designed the Project to manage road density and secure habitat at levels that allow for grizzly bear occupancy." (*Id.* at 26.) But, as explained above, the legal standard for analyzing the desired condition is whether the project would foreclose the opportunity to maintain or achieve this desired condition, over the long term. 36 C.F.R. § 219.15(d).

According to the Project EA, while there have been no verified sightings of grizzly bears, the USFWS believes they may be present in the Project area. (Doc. 7-2 at 42.) The Project area is within two GBUs: the Middle Big Belt GBU, and the South Big Belt GBU. Prior to implementation of the Project, both units had

15

motorized route densities of 1.8 miles per square mile. (Doc. 14-2 at 26.) The South Big Belt GBU road density will remain unchanged during project implementation. (*Id.* at 27.) The motorized route density in the Middle Big Belt GBU will increase slightly during Project implementation to 1.9 miles per square mile, which is within appropriate thresholds. (*Id.* at 31.)

The Species Report concluded that "connectivity would not be impeded through the [P]roject area during implementation although any grizzly bears that may occur in the [P]roject area may have to temporarily adjust travel patterns." (*Id.*) The Species Report explained that the "treatment units are on the fringe of grizzly bear secure habitat and inventoried roadless areas such that disruptions to movement across the landscape should be minimal." (*Id.* at 26.) As such, according to the Species Report, the Project is consistent with Forest Plan Desired Condition BB-WL-DC-03. (*Id.* at 31.)

Based on the thorough findings and explanations provided in the Species Report, the Court does not find serious questions going to the merits of Plaintiffs' claims that: (1) the Project does not comply with Desired Condition BB-WL-DC-03; and (2) USFS failed to take a hard look at the impacts of the Project on grizzly bears connectivity.

## II. Likelihood of Irreparable Injury

Under *Winter*, "a plaintiff must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction. *Cottrell*, 632 F.3d at 1128. Not every potential environmental injury warrants an injunction. *Id.* at 1135. Timber cutting is not inherently damaging to forests and irreparable harm does not automatically arise from all environmental impacts caused by logging. *Earth Island Inst. v. Carlton*, 626 F.3d 462, 474 (9th Cir. 2010).

Here, Plaintiffs allege that "[i]f operations are allowed to proceed as planned, the area will be irreversibly degraded because once logging occurs, [USFS] cannot put the trees back on the stumps, and our interests in the area will be irreparably harmed to the point that the area is no longer adequate for our esthetic, recreational, scientific, spiritual, vocational, and educational interests. In other words, this area will never look or be the same during the lifetimes of our members." (Doc. 7 at 28.) Plaintiffs cite to *Cottrell*, where the Ninth Circuit found that members of Alliance for the Wild Rockies were likely to suffer irreparable harm because the project at issue would harm their "ability to 'view, experience, and utilize' the areas in their undisturbed state." (*Id.* (citing 632 F.3d at 1135))

While the type of injury alleged by Plaintiffs might ordinarily satisfy the irreparable harm prong, here, Plaintiffs waited seven months to file the instant motion. During this period of delay, considerable ground-disturbing activities have

occurred. As this Court has repeatedly and consistently explained, a delay of even a few months is a significant delay in the life of a timber sale operation. *See Yellowstone to Uintas Connection v. Marten*, 2024 WL 3400524, at *6 (D. Mont. July 12, 2024); *see also Helena Hunters & Anglers Ass'n v. Marten*, 2019 WL 5069002, at *2 (D. Mont. Oct. 9, 2019). While the Court remains sympathetic to the challenges associated with balancing a large caseload, the Court's sympathy is dwindling. Counsel's busy schedule does not negate the impression that if the need for a preliminary injunction had been deemed essential prior to implementation of the Project, counsel would have found the time. Delay alone, however, is not enough to deny Plaintiffs' Motion. Accordingly, the Court moves on to the balance of equities and the public interest.

### III. Balance of Equities and the Public Interest

The Project is designed to address ongoing insect activity in the project area and minimize potential widescale tree mortality while creating a landscape that is more resilient to future climates and disturbances. (Doc. 7-2 at 11.) The Project EA states that the proposed activity will result in diverse and sustainable forest stands and habitat for the future; promote healthy, desirable regeneration; and recover the economic value of forest products in order to contribute to employment and income in local communities. (*Id.*)

18

Regarding employment and income, Sun Mountain Lumber employs approximately 160 people in its Deer Lodge location and is the largest private employer in the area. (Doc. 10-3 ¶ 5.)  Because Sun Mountain Lumber does not own any private timberlands, it is heavily dependent on log inventory originating from National Forests. (*Id.* ¶ 10.) Sun Mountain Lumber now operates a second mill in Livingston, Montana, where material from the Wood Duck Timber Sale is being processed. (*Id.* ¶ 40.) The Livingston mill provides approximately 65 vital family-wage jobs to the local community. (*Id.* ¶ 9.)

Sun Mountain Lumber was awarded the Wood Duck Tiber Sale in September 2024 and paid a total of $120,225.35 for the sale. (*Id.* ¶ 30.) Sun Mountain Lumber has already expended $62,000 on the Project. (*Id.* ¶ 31.) Sun Mountain Lumber estimates that the financial impact—if the Project is enjoined—will be $3,000,000 in lost revenue that would be reflected in lost wages for its employees and sub-contractors, their families, service providers, and communities. (Doc. 14-3 ¶ 2.)

In addition, a preliminary injunction would halt contract logging operations led by Myrstol Logging, Inc., impacting approximately 20 employees who rely on the continuity of timber sales for stable, year-round employment. (*Id.* ¶ 1.)

The Court finds that the mitigation of widescale tree mortality and the promotion of a more healthy, desirable forest, combined with the economic

19

benefits to the local community outweigh any public interest in maintaining the Project area's current state.

**CONCLUSION**

Plaintiffs have not raised serious questions going to the merits of their claims. Likewise, Plaintiffs have failed to establish a likelihood of irreparable harm. The balance of the equities and public interest favor allowing the Wood Duck Project to proceed.

Accordingly, IT IS ORDERED that Plaintiffs' Motion (Doc. 6) is DENIED.

DATED this 10th day of June, 2025.

Dana L. Christensen, District Judge
United States District Court